**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JENNIFER L. LOMBRANO,

    Plaintiff,

    v.

DEPARTMENT OF THE AIR FORCE,

    Defendant.

Civil Action No. 1:21-cv-00872 DLF

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ............................................................................................ 3

**INTRODUCTION** ........................................................................................................... 4

**STATEMENT OF THE FACTS** ..................................................................................... 4

    I.      **Background.**      4

    II.      **Dr. Lombrano Seeks Medical Treatment at Joint Base Elmendorf-Richardson.**      6

    III.      **Colonel Christine Campbell, USAF, and an Unknown JBER Security Police Officer Disclose Information from Records Concerning Dr. Lombrano, in Violation of the Privacy Act.**      9

    IV.      **Dr. Lombrano's Assignment to SouthCentral Foundation Is Terminated.**      18

    V.      **Dr. Lombrano Suffers Damages from Her Terminated Assignment.**      21

**STATEMENT OF THE LAW** ......................................................................................... 23

    I.      **Federal Rule of Civil Procedure 56 – Motions for Summary Judgment.**      23

    II.      **Privacy Act Claims Generally.**      24

**ARGUMENT** .................................................................................................................. 24

    I.      **The Air Force Disclosed Information About Dr. Lombrano Contained Within a System of Records.**      25

    II.      **The Air Force's Disclosure of Dr. Lombrano's Information Was Improper.**      26

    III.      **The Air Force's Disclosure of Dr. Lombrano's Information Was Willful and Intentional.**      30

    IV.      **The Air Force's Disclosure of Dr. Lombrano's Information Has Adversely Impacted Dr. Lombrano.**      32

**CONCLUSION** ............................................................................................................... 36

**CERTIFICATE OF SERVICE** ...................................................................................... 38

## TABLE OF AUTHORITIES

**CASES**

*Albright v. United States*, 732 F.2d 181 (D.C. Cir. 1984) ........................................................ 30

*Bartel v. Fed. Aviation Admin.*, 725 F.2d at 1409 (D.C. Cir. 1984) ................................. 26, 27, 29

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ........................................................... 23, 24

*Chambers v. U.S. Dep't of Interior,* 568 F.3d 998 (D.C. Cir. 2009) .............................................. 24

*Cloonan v. Holder*, 768 F. Supp. 2d 154 (D.D.C. 2011) ................................................................ 26

*Doe v. Chao*, 540 U.S. 614 (2004) ........................................................................................... 32, 33

*Doe v. U.S. Dep't of Treasury*, 706 F. Supp. 2d 1 (D.D.C. 2009) ........................................... 26, 29

*Doe v. U.S. Department of Justice*, 660 F. Supp. 2d 31 (D.D.C. 2009) ................................. passim

*Doe v. U.S. Dept. of Labor*, 451 F.Supp.2d 156 (D.D.C. 2006) ....................................... 30, 31, 32

*Doe v. U.S. Postal Service,* 317 F.3d 339, 342, 343 (D.C. Cir. 2003) ......................................... 26

*Dong v. Smithsonian Inst.*, 943 F.Supp. 69 (D.D.C.1996) ....................................................... 30, 32

*Dong v. Smithsonian Inst.*, 125 F.3d 877 (D.C. Cir. 1997) ......................................................... 30

*Fed. Aviation Admin. v. Cooper,* 566 U.S. 284 (2012) ................................................................ 32

*Fisher v. Nat'l Institutes of Health*, 934 F.Supp. 464 (D.D.C.1996). ........................................... 26

*Mulhern v. Gates*, 525 F.Supp.2d 174 (D.D.C.2007) ................................................................. 32

*Pilon v. U.S. Dep't of Justice*, 73 F.3d 1111 (D.C. Cir. 1996) ........................................ 26, 27, 29

*Tobey v. NLRB*, 40 F.3d 469 (D.C. Cir. 1994) ............................................................................. 25

*White v. Office of Pers. Mgmt.*, 840 F.2d 85 (D.C. Cir. 1988) ..................................................... 30

**STATUTES**

42 U.S.C. § 202 ....................................................................................................................... 29, 30

5 U.S.C. § 552a ............................................................................................................ 25, 26, 30, 32

**RULES**

Fed. R. Civ. Pro. 56(c) ................................................................................................................. 24

**INTRODUCTION**

Dr. Jennifer Lombrano worked as an oral maxillofacial surgeon in the United States Public Health Service on assignment at SouthCentral Foundation.  In August 2020, when Dr. Lombrano began experiencing a mental health crisis, she acted quickly to get herself treatment and ensure that her patients' care would not be compromised. But agents of the Air Force disclosed Dr. Lombrano's protected information in violation of the Privacy Act on multiple occasions. This led to the termination of Dr. Lombrano's assignment at SouthCentral Foundation, costing her millions of dollars in damages both now and in the future. Because the Air Force disclosed information about Dr. Lombrano contained within a system of records, the Air Force's disclosure of Dr. Lombrano's information was improper, the Air Force's disclosure of Dr. Lombrano's information was willful and intentional, and the Air Force's disclosure of Dr. Lombrano's information has adversely impacted Dr. Lombrano, Dr. Lombrano is entitled to summary judgment.

**STATEMENT OF THE FACTS[1]**

**I.      Background.**

Dr. Jennifer L. Lombrano is a highly successful oral maxillofacial surgeon. Born in 1969, Dr. Lombrano graduated from St. Mary's University in San Antonio, Texas with a Bachelor of Arts degree in Biology in May 1998. ECF No. 38 ("Second Amend. Compl."), ¶11. Dr. Lombrano earned her Doctor of Dental Surgery from the University of Texas Health Science Center at San Antonio, Texas in May 2002. Second Amend. Compl., ¶12. Dr. Lombrano completed her Advanced General Practice Residency at the Alaska Native Medical Center, in Anchorage, Alaska, in June 2006, and completed an Oral and Maxillofacial Surgical Residency at the Womack Army Medical Center, Fort Bragg, North Carolina, in September 2010. Second Amend. Compl., ¶¶13-

---

[1] Dr. Lombrano submits a separate statement of material facts as to which there is no genuine issue pursuant to Local Civil Rule 7(h)(1). *See* ECF No. 39-2.

14. In August 2020, Dr. Lombrano practiced as an oral maxillofacial surgeon at the SouthCentral Foundation, where she was on assignment from the United States Public Health Service ("PHS") pursuant to a memorandum of agreement. *See, e.g.,* Second Amend. Compl., ¶16.

Dr. Lombrano enjoyed working at the SouthCentral Foundation and intended to continue working there as a direct tribal hire following her retirement from the PHS. *See, e.g.,* ECF No. 39-3 ("Crabtree Aff."), ¶¶68-70. Dr. Clay Crossett, who was Dental Director at SouthCentral Foundation from 2006 until July 2020 and supervised Dr. Lombrano in that role, testified that Dr. Lombrano told him of her intentions to become a tribal hire following her retirement from the PHS on approximately four or five occasions. ECF No. 39-4 ("Crossett Dep.") at page 10, 12, 13. Dr. Crossett testified that while not all PHS officers working at SouthCentral Foundation become tribal hires upon retirement from the PHS, he was "95 percent" confident that Dr. Lombrano would become tribal hire, owing to "a long-working relationship with Dr. Lombrano" and her "skill set and her empathy for her patients." Crossett Dep., at pages 16, 18

In August of 2020, Dr. Lombrano was married to Mr. William Crabtree. Crabtree Aff., ¶2. Together, Dr. Lombrano and Mr. Crabtree operated a company called Southpointe Surgical Assist. Crabtree Aff., ¶71. Beginning August 10, 2016, Southpointe Surgical Assist obtained a contract with Providence Alaska Medical Center, which Mr. Crabtree estimated paid himself and Dr. Lombrano approximately $821,250.00 annually. Crabtree Aff., ¶¶71-77; *see* ECF No. 39-5 ("Contract") at page 11, providing that Providence Alaska Medical Center would pay Southpointe Surgical Assist "a daily rate of $2250 per day for call coverage provided hereunder."[2] The contract

---

[2] For Southpointe Surgical Assist, Dr. Lombrano and Mr. Crabtree reported $338,680 in qualified service income and $524,911.00 in Section 199A W-2 wages in 2019, $454,164 in ordinary income and $216,918 in W-2 wages in 2021, and $260,402 in ordinary income and $46,667 in W-2 wages in 2022. In 2020, Dr. Lombrano and Mr. Crabtree reported $429,116 in wages, salaries, and tips, as well as $574,738 in other income. A substantial portion of both sources of income was the

between Southpointe Surgical Assist and Providence Alaska Medical Center required Dr. Lombrano, as a treating physician, to abide by "the Roman Catholic moral tradition" and notify Providence Alaska Medical Center in the event of her termination from SouthCentral Foundation. *See* Contract at page 2, paragraph 1.1.1.F, and page 4, paragraph 2.2.1. The contract also provided that Dr. Lombrano was required to abide by Providence Alaska Medical Center's substance abuse policy and could be promptly removed from her position for failure to do so. Contract at page 6, paragraph 9.1.

## II.    Dr. Lombrano Seeks Medical Treatment at Joint Base Elmendorf-Richardson.

Over the course of several nights in early August of 2020, Dr. Lombrano began experiencing acute mental distress and anxiety. Crabtree Aff., ¶3. For that reason, on or about August 10, 2020, Dr. Lombrano and Mr. Crabtree together decided that she would seek treatment at Schick Shadel Hospital in Burien, Washington.  Crabtree Aff., ¶¶4, 5. Because of the high-profile nature of both Dr. Lombrano and Mr. Crabtree's work in the Alaskan medical community at the time, they both agreed that it would be in their best financial and personal interests to keep her treatment discreet, which is part of the reason they sought an out-of-state provider. Crabtree Aff., ¶6. As lifelong medical professionals, Dr. Lombrano and Mr. Crabtree were both acutely aware of the damage which adverse information about a physician's mental health can do to their career, particularly in a small medical community like Alaska. Crabtree Aff., ¶7. For this reason, Dr. Lombrano and Mr. Crabtree both wanted to avoid any disclosure, not because they did not want Dr. Lombrano to get help, but because both were concerned about potential economic losses and damage to her professional reputation. Crabtree Aff., ¶8. For this reason too, Dr. Lombrano

---

contract with Providence Alaska Medical Center. *See* ECF No. 39-11 ("Tax Documents") at pages 34, 67, 77, 78, 117, 118.

and Mr. Crabtree resolved to pay for Dr. Lombrano's treatment at Schick Shadel out of pocket. Crabtree Aff., ¶9.

On August 11, 2020, the day after Dr. Lombrano and Mr. Crabtree together arrived at this plan, Dr. Lombrano was scheduled to work at SouthCentral Foundation. Crabtree Aff., ¶10. At that time, Dr. Abby DeBonis was serving as interim Dental Director at SouthCentral Foundation. Within this role, she supervised Dr. Lombrano. ECF No. 39-6 ("DeBonis Dep.") at pages 25-26, 29, 33-37, 50, 186 (Q: "So you were Dr. Lombrano's supervising officer at the time? A: By default, yes"). Prior to August 2020, Dr. DeBonis testified that she had no concerns about any type of mental or physical health problems, or drug or alcohol abuse, by Dr. Lombrano. DeBonis Dep. at pages 39-41, 45-46. Dr. DeBonis had also had conversations with Dr. Lombrano prior to August of 2020 about Dr. Lombrano's desire to remain at SouthCentral Foundation as a tribal hire following Dr. Lombrano's retirement from the PHS. DeBonis Dep. at pages 41-44.

At approximately noon on August 11, 2020, Dr. DeBonis and Dr. Lombrano had a conversation, initiated by Dr. Lombrano. In that conversation, Dr. Lombrano mentioned to Dr. DeBonis that she was not feeling well and requested permission to go to United States Air Force Joint Base Elmendorf Richardson ("JBER"). DeBonis Dep. at pages 57-61, 63, 64, 157-160. The purpose of Dr. Lombrano's visit to JBER was to get medical clearance for her visit to Schick Shadel. Crabtree Aff., ¶12. Dr. DeBonis did not share this conversation with the Human Resources department at SouthCentral Foundation. DeBonis Dep. at pages 143-145.

Following this conversation, in the afternoon of August 11, 2020, Mr. Crabtree picked Dr. Lombrano up from SouthCentral Foundation and drove her to JBER to complete the medical clearance. Crabtree Aff., ¶13. When Dr. Lombrano and Mr. Crabtree arrived at JBER, they went to the emergency room. Dr. Lombrano was taken into an exam room to take her vital signs while

Mr. Crabtree waited in the waiting room. Crabtree Aff., ¶¶14-15. Following her exam, the medical staff informed Dr. Lombrano that they wanted her to remain overnight for a medical evaluation owing to her history of cardiac ablation in May 2019. Crabtree Aff., ¶17. This made sense to both Dr. Lombrano and Mr. Crabtree, and Dr. Lombrano agreed. Crabtree Aff., ¶18.

30 to 40 minutes later, a nurse escorted Dr. Lombrano and Mr. Crabtree upstairs to the medical hold unit. Crabtree Aff., ¶19. Based on his own experience at JBER, Mr. Crabtree began to realize that they were not heading toward the medical floor of the facility. Crabtree Aff., ¶20. When he pointed this out to the nurse, the nurse informed Mr. Crabtree that the floor was full, and that she was therefore taking Dr. Lombrano to the overflow unit, which is the psych ward. Crabtree Aff., ¶21. Based their familiarity with medical procedures, neither Mr. Crabtree nor Dr. Lombrano saw this as an issue. Crabtree Aff., ¶22.

Upon entering the psych ward, the nurse informed Dr. Lombrano and Mr. Crabtree that even though Dr. Lombrano was an overflow patient, not a psych patient, she would still need to abide by the rules of the floor. Crabtree Aff., ¶23. At this point, Dr. Lombrano and Mr. Crabtree still intended for Dr. Lombrano to remain on the psych ward overnight while she got her medical clearance for Schick Shadel, and Mr. Crabtree would come pick her up the next day, August 12, 2020. Crabtree Aff., ¶25. Mr. Crabtree left JBER that afternoon and returned home. Crabtree Aff., ¶26. He did not speak to any person about Dr. Lombrano's current medical condition, past medical history, or any other matter concerning Dr. Lombrano's health on August 11, 2020. Crabtree Aff., ¶27.

During her admission to JBER, Dr. Lombrano's belongings were confiscated and inventoried. Second Amend. Compl., ¶28. In that inventory, hospital officials seized three 2 milligram gummy bears infused with THC, the metabolite for marijuana. Second Amend. Compl.,

8

¶29. Dr. Lombrano insisted, in response to questions from JBER law enforcement, that the gummy bears did not belong to her and that she had been on a camping trip with friends who must have left them in her bag, which they had all been sharing on the trip, by mistake. Second Amend. Compl., ¶30.

### III.    Colonel Christine Campbell, USAF, and an Unknown JBER Security Police Officer Disclose Information from Records Concerning Dr. Lombrano, in Violation of the Privacy Act.

During her stay at JBER, Dr. Lombrano was treated by Colonel Campbell. Although Colonel Campbell prepared a treatment note for Dr. Lombrano reflecting her intake on August 11, 2020, Colonel Campbell confirmed that she did not begin treating Dr. Lombrano until either Dr. Lombrano's first or second full day at JBER, which would have been either August 12 or 13, 2020. *See* ECF No. 39-7 ("Campbell Dep.") at pages 20-21.

During her deposition, Colonel Campbell recalled that in her initial conversation with Dr. Lombrano, Dr. Lombrano indicated that she "had been experiencing stress and that she wanted to get help and that she had a history of getting help for psychiatric issues and she very much wanted to do her treatment, you know, her way, in her manner." Campbell Dep. at page 22. Colonel Campbell clarified that this meant that Dr. Lombrano "didn't want anybody else to know about the problems that she was having." Campbell Dep. at page 23. Nevertheless, Colonel Campbell viewed it as her obligation as a physician to determine the nature of Dr. Lombrano's issues as "in depth" as possible. Campbell Dep. at page 24. Colonel Campbell asked Dr. Lombrano if she was having drug and alcohol dependency issues; while Dr. Lombrano responded that she was not, Colonel Campbell strongly suspected this was untrue. Campbell Dep. at pages 24-26.

In the deposition, Colonel Campbell further indicated that she prepared a variety of treatment notes during her treatment of Dr. Lombrano. Campbell Dep. at pages 42-45, 65-66, 127-131. In a note authenticated by Colonel Campbell and signed on August 12, 2020, Colonel

Campbell indicated that Dr. Lombrano had recently been "drinking excessively." Campbell Dep. at pages 127-130 (Colonel Campbell authenticates note); 131 (quotation). In the same note, Colonel Campbell also wrote that Dr. Lombrano had told her that she had "put a loaded gun in her mouth." Campbell Dep. at page 133. Colonel Campbell also wrote in this note that Dr. Lombrano had been "using [her] self-driving car while she has a cocktail drinking to black out." Campbell Dep. at page 141.

Colonel Campbell confirmed that Dr. Lombrano told her "many times" that she wanted to leave JBER. Campbell Dep. at page 54; *see also* Campbell Dep. at pages 58, 59. But Colonel Campbell would not permit this. *See, e.g.,* Campbell Dep. at page 54 ("We told her that we did not think it was in her best interest for her to leave and we wanted her to get treatment that she really needed and we were willing to help assist and set that up"); Campbell Dep. at pages 60-62, 75 (Colonel Campbell confirms that her consent was required to discharge Dr. Lombrano from JBER). Colonel Campbell did recall being told by Dr. Lombrano that Dr. Lombrano wanted to leave and pursue treatment at Schick Shadel, though Colonel Campbell could not recall exactly when that conversation occurred. Campbell Dep. at page 63. *See also* Crabtree Aff., ¶¶40-62 (describing Colonel Campbell's refusal to allow Dr. Lombrano to leave JBER at certain points).

Although Colonel Campbell could not recall the exact day she contacted SouthCentral Foundation, she was able to recall that it was after speaking with Mr. Crabtree. Campbell Dep. at pages 83, 84, 89. Mr. Crabtree recalls that he first spoke to Colonel Campbell on August 12, 2020. Crabtree Aff., ¶30. In that conversation, Colonel Campbell informed Mr. Crabtree that she had concerns about Dr. Lombrano's safety. Colonel Campbell also informed Mr. Crabtree that she had concerns about Dr. Lombrano's use of drugs and alcohol. Crabtree Aff., ¶31.

10

Mr. Crabtree informed Colonel Campbell that he was aware of Dr. Lombrano's issues and had his own perspective on them. He further advised Colonel Campbell that together, he and Dr. Lombrano had decided that Schick Shadel was the optimal place for her treatment to continue. He told Colonel Campbell that their only purpose in coming to JBER had been to obtain a medical clearance. Crabtree Aff., ¶32.

Colonel Campbell told Mr. Crabtree that she had concerns about Dr. Lombrano hurting herself or potentially being suicidal. Crabtree Aff., ¶33. Mr. Crabtree emphasized to Colonel Campbell that he did not believe Dr. Lombrano was suicidal. He stressed to Colonel Campbell that Dr. Lombrano had experienced a crisis, and that he wanted to get her additional help at Schick Shadel, and that Dr. Lombrano was at JBER for medical clearance only. Crabtree Aff., ¶34.

Colonel Campbell reemphasized her concerns and told Mr. Crabtree that she intended to inform people about Dr. Lombrano's condition. Crabtree Aff., ¶35. Mr. Crabtree specifically told Colonel Campbell to not contact SouthCentral Foundation or anyone who worked there. Mr. Crabtree told Colonel Campbell that because Dr. Lombrano was a commissioned officer in the PHS, that Colonel Campbell needed to contact her PHS supervisor, Dr. DeBonis. Crabtree Aff., ¶36. Mr. Crabtree offered to give Dr. DeBonis's phone number to Colonel Campbell but cannot recall if Colonel Campbell took him up on this offer. Crabtree Aff., ¶37. Mr. Crabtree had Dr. DeBonis's phone number because she had previously worked (part-time on the side) for Southpointe Surgical Assist, from approximately 2017 to 2020. Crabtree Aff., ¶38.

Colonel Campbell stated that "someone who worked on the ward in an official capacity" alerted her to the presence of a THC gummy in Dr. Lombrano's bag. Campbell Dep. at page 36. Colonel Campbell could not identify who this person was or what their role was. Campbell Dep. at pages 36-38. Additionally, Colonel Campbell did not say that this person had told her that Dr.

11

Lombrano had been given a citation for the THC gummy bears in her bag. Campbell Dep. at pages 30–40. However, Colonel Campbell also testified that she had been given Dr. Lombrano's citation to present to her, and that she personally gave the citation to Dr. Lombrano. Campbell Dep. at page 82, 96-98.

Colonel Campbell testified that she then informed Dr. Lombrano's "command" at the SouthCentral Foundation that "that she [Dr. Lombrano] was at risk of harming herself; that she had a serious alcohol problem; and that she really wasn't mentally stable; and I [Colonel Campbell] had significant concerns about her [Dr. Lombrano]." Campbell Dep. at pages 90, 91. Additionally, Colonel Campbell stated she may have referenced the citation when contacting SouthCentral Foundation. Campbell Dep. at page 91. Colonel Campbell believed disclosing the information chronicled in the treatment notes she prepared was permissible under "60-25-18, that's the DHA [Defense Health Agency] guidance; we have DOD [Department of Defense] guidance 64-90-08; and then we have 44-172, that's our AFI [Air Force Instruction]," and because Colonel Campbell believed she made the minimum necessary disclosures regarding Dr. Lombrano's condition. Campbell Dep. at page 108; *see also* Campbell Dep. at pages 106-108, 111-113.

Corroborating Colonel Campbell's testimony, Dr. DeBonis testified that she spoke with Colonel Campbell on the phone, and that prior to this call, she had never spoken with Colonel Campbell before, but that there had been some back-and-forth communication between the two of them to set up the call. DeBonis Dep. at pages 78-80. Dr. DeBonis testified that her call with Colonel Campbell call was not on August 11, 2020, but that it could have happened any time after that during Dr. Lombrano's stay at JBER. DeBonis Dep. at pages 78-79. On this call, Colonel Campbell expressed that she had been concerned about Dr. Lombrano returning to work, and wanted to reach out to Dr. DeBonis to make sure that did not happen. DeBonis Dep. at pages 81-

12

83, 84, 85, 86. Dr. DeBonis expressed that she believed she was not the proper person to receive Colonel Campbell's call, and shared Colonel Campbell's information with the Human Resources department at SouthCentral. DeBonis Dep. at pages 83, 86, 87. Dr. DeBonis also assumed that she gave Colonel Campbell information to contact the Human Resources department at SouthCentral, though she could not be certain that she had done so. DeBonis Dep. at pages 87-89.

Dr. DeBonis admitted that this phone call from Colonel Campbell caused her to have concerns about Dr. Lombrano's ability to treat patients, a concern she had not previously held. DeBonis Dep. at pages 99 ("Q:…you received a phone call from Colonel Campbell. My question is: Is that the point when you developed concern about Dr. Lombrano's ability to treat patients?...A: Yes."), 105.

On the morning of August 12, 2020, someone from the JBER security police contacted the front desk at SouthCentral Foundation. DeBonis Dep. at page 70. This person was not Colonel Campbell. DeBonis Dep. at page 122. At the time, Captain Martha Wanca was serving as the Western Region Commissioned Corps Liaison. *See* ECF No. 39-8 ("Wanca Dep.") at page 13. Captain Wanca confirmed that in this role, she was "basically a human resource personnel officer" for PHS officers. Wanca Dep. at 13, 15. Captain Wanca confirmed that Dr. Lombrano was one of the officers within her purview in August 2020. Wanca Dep. at 16-18. Captain Wanca also testified that she had no concern about Dr. Lombrano's work, ability to treat patients, mental health, or alcohol abuse prior to August 2020. Wanca Dep. at pages 17-20.

On August 12, 2020, Captain Wanca received a call from a JBER security police officer. Wanca Dep. at pages 20, 33-34; *see also* Wanca Dep. at page 86. The JBER officer informed Captain Wanca that Dr. Lombrano had been discovered with drugs on base and that charges would be filed. Wanca Dep. at pages 22, 24. The officer further informed Captain Wanca that Dr.

Lombrano had been issued a citation. Wanca Dep. at page 24. The officer asked Captain Wanca if Dr. Lombrano was a PHS officer, and Captain Wanca confirmed that this was correct. Wanca Dep. at page 25. The JBER security police officer also asked if Dr. Lombrano was subject to the Uniform Code of Military Justice. Captain Wanca stated, accurately, that she was not. Wanca Dep. at 34, 35. Prior to this phone call, Captain Wanca had not been aware that Dr. Lombrano had been hospitalized at JBER, or that Dr. Lombrano had received a citation for possession of marijuana at JBER. *See* Wanca Dep. at pages 32, 33, 36.

Following this conversation, Captain Wanca called Ms. Karen McIntire. Wanca Dep. at pages 44, 45. In August of 2020, Ms. McIntire was serving as the Senior Human Resource Director at SouthCentral. ECF No. 39-9 ("McIntire Dep.") at page 16. Ms. McIntire testified that if an employee needed to be terminated at SouthCentral, her role would be to make a recommendation to the Vice President of Organizational Development and Innovation, who would then make a recommendation regarding the employee to SouthCentral's Chief Executive Officer. McIntire Dep. at pages 19-22. In August 2020, the Vice President of Organizational Development and Innovation at SouthCentral Foundation was Ms. Michelle Tierney. McIntire Dep. at page 21. Ms. McIntire testified that she had no dealings whatsoever with Dr. Lombrano prior to August 2020, and that she therefore did not think Dr. Lombrano had mental health problems, or problems with alcohol or other drugs prior to that date. McIntire Dep. at pages 25-27.

Captain Wanca informed Ms. McIntire about her conversation with the JBER security police officer. Wanca Dep. at pages 44, 45. While Captain Wanca testified that she had a number of phone conversations with Ms. McIntire following her conversation with the JBER security police officer on August 12, 2020, she was "pretty sure" that she told Ms. McIntire about the contents of the call during the pair's first conversation. Wanca Dep. at pages 46-47. While Captain

Wanca did not recall specifically using the word "citation" in her conversation with Ms. McIntire, she did recall clearly communicating to Ms. McIntire that Dr. Lombrano had been hospitalized at JBER and was going to be criminally charged based on what she had heard from the JBER security police officer. Wanca Dep. at pages 45, 48-50.

Ms. McIntire confirmed that she had this conversation with Captain Wanca and stated that the conversation occurred on the morning of August 13, 2020. Ms. McIntire stated that she learned from Captain Wanca that Ms. Brenda Porter, a SouthCentral employee, had given a JBER security police officer Captain Wanca's number, and that the JBER security police officer had called Captain Wanca, asking if PHS officers were covered by the Uniform Code of Military Justice. McIntire Dep. at pages 32-37; *see also* McIntire Dep. at pages 125-134. Ms. McIntire testified that in this conversation, Captain Wanca shared with her that Dr. Lombrano had been issued a citation at JBER. McIntire Dep. at pages 125-134. Ms. McIntire also testified that August 13, 2020, was the first that Ms. McIntire learned that Dr. Lombrano had been admitted to JBER, although she believed she received this information from Dr. DeBonis. McIntire Dep. at page 38.

Ms. McIntire later organized a call to Colonel Campbell with herself, Captain Wanca, and Ms. Michelle Aregood. McIntire Dep. at pages 39-42. (At the time, Ms. Aregood was serving as the Director of Quality Assurance at the SouthCentral Foundation. McIntire Dep. at page 36.) Ms. McIntire testified that she had known to contact JBER because of Colonel Campbell's previous conversation with Dr. DeBonis. McIntire Dep. at page 40. Ms. McIntire further testified that the call between herself, Captain Wanca, Colonel Campbell, and Ms. Aregood took place on August 13, 2020. McIntire Dep. at pages 44-47.

Ms. McIntire testified that during the call, she listened to Colonel Campbell while Ms. Aregood took notes. McIntire Dep. at pages 47-49. Ms. McIntire stated that her review of Ms.

15

Aregood's notes allowed her to recall the conversation and authenticated the notes as an accurate reflection of the conversation. *Id.*

Ms. McIntire stated that during the phone call, Colonel Campbell told herself, Capt. Wanca, and Ms. Aregood that Dr. Lombrano had a "pretty significant" alcohol use problem, that Colonel Campbell was concerned about her returning to treat patients at SouthCentral Foundation, that Colonel Campbell had been encouraged to contact Dr. Lombrano's licensing board, that Dr. Lombrano was resistant to seeking treatment, that Mr. Crabtree had told Colonel Campbell that Dr. Lombrano used marijuana and other drugs on a regular basis, that Mr. Crabtree had told Colonel Campbell that Dr. Lombrano lost consciousness most nights, that Colonel Campbell did not think that Dr. Lombrano would be ready to begin seeing patients again when she finished treatment, and that JBER was hoping to transfer Dr. Lombrano to the inpatient unit. McIntire Dep. at pages 48-66, 100-101, 174-176.

Following her conversation with Colonel Campbell, Ms. McIntire concluded that Dr. Lombrano needed substance abuse treatment. McIntire Dep. at page 82. This was not a view which Ms. McIntire had previously held. McIntire Dep. at pages 23-26.

Ms. McIntire also testified that she was aware of the existence of Dr. Lombrano's citation, and that she had received the citation while hospitalized at JBER, because Captain Wanca had informed her about the citation. McIntire Dep. at pages 96-98.

At around the same time, Captain Wanca stated that she spoke on the phone with a physician, although she could not recall with certainty whether that physician was Colonel Campbell. Wanca Dep. at pages 69, 71. During that call, Captain Wanca discussed Dr. Lombrano's hospitalization with the physician. Wanca Dep. at page 73. In her deposition, Captain Wanca authenticated an email that she had written on August 14, 2020, at 9:10 p.m., which memorialized

16

many of the factual particulars of her call with the JBER security police officer on August 12, 2020. Wanca Dep. at pages 27-29.

On or about August 14, 2020, Dr. DeBonis spoke on the phone with Dr. Lombrano. *See* DeBonis Dep. at pages 77, 80, 117, 119, 120, 126, 156, 173 (Dr. DeBonis is unclear about when exactly this conversation with Dr. Lombrano took place but recalled that it occurred and that her best recollection is that the date was August 14, 2020). For the first time, Dr. DeBonis learned that Dr. Lombrano had been searched at JBER and that the search had located "gummies." Dr. DeBonis didn't recall "if she [Dr. Lombrano] told me what those gummies were. My assumption thinking back now is that they were, like, with THC, clearly a banned substance for active duty officers to be using and to have on federal property. So that's when I became aware of that. I do recall her telling me that they were not hers." DeBonis Dep. at page 117. Dr. DeBonis did not believe that any of the details of this conversation had been shared with the Human Resources department at SouthCentral Foundation. DeBonis Dep. at page 118. Dr. DeBonis testified that even following this conversation, she saw no reason why Dr. Lombrano should not have returned to work, and that Dr. DeBonis would have been happy to have Dr. Lombrano back. DeBonis Dep. at page 180, 193-194.

On August 17, 2020, Captain Wanca received another call from the same JBER security police officer who had called her on August 12, 2020. Wanca Dep. at page 87. That same day, August 17, 2020, Captain Wanca wrote another email memorializing her second call with the JBER security police officer. Captain Wanca also authenticated this email during her deposition. Wanca Dep. at pages 84, 85. On this call, Captain Wanca learned from the JBER security police officer that Dr. Lombrano had "been charged with a federal criminal violation of 21 USC, Section 844, simple possession. These charges are being brought before a federal magistrate in a court

17

appearance on 10 November 2020 at 2 p.m." Wanca Dep. at page 88. Captain Wanca did not know why the JBER security police officer had called her again, but did not recall asking him to do so. Wanca Dep. at pages 88, 89. During the call, the JBER security police officer stated that Dr. Lombrano "appeared to be out of control, refused to sign the citation and ripped up her portion" of the citation. Wanca Dep. at page 89.

Captain Wanca did not recall whether she did or did not mention Dr. Lombrano ripping up the citation to Ms. McIntire. Wanca Dep. at page 93. However, Ms. McIntire testified that on August 19, 2020, Captain Wanca informed her that Dr. Lombrano had ripped up the citation she had received at JBER. McIntire Dep. at pages 131-132.

IV.    **Dr. Lombrano's Assignment to SouthCentral Foundation Is Terminated.**

During her deposition, Ms. McIntire authenticated an email from Dr. Lombrano which was forwarded to her. McIntire Dep. at pages 94-95. Ms. McIntire also authenticated an attachment to the email. McIntire Dep. at page 95.  This attachment was an electronic copy of the citation which Dr. Lombrano had received from JBER, sent by Dr. Lombrano to Ms. McIntire. *See* ECF No. 39-10 ("Citation"). Ms. McIntire testified that Dr. Lombrano had been asked to send her a copy of the citation by either Dr. DeBonis or Ms. Carla Ogle, a Senior Human Resources Generalist, Human Resources, at the SouthCentral Foundation. McIntire Dep. at page 101. Ms. McIntire testified that she had requested the citation from Dr. Lombrano because, based on her conversation with Captain Wanca, she was concerned that Dr. Lombrano had violated SouthCentral Foundation's background check procedures. McIntire Dep. at page 103; *see also* McIntire Dep. at pages 126-130, 133-135 (establishing that Ms. McIntire learned of the disclosure of the citation through Captain Wanca).

A final quality review dated August 28, 2020, of the one patient whom Dr. Lombrano had seen on August 11, 2020, concluded that there were no indications that Dr. Lombrano had not met the appropriate standard of care during her treatment of this patient. *See* DeBonis Dep. at pages

18

194-197. Nevertheless, that same day, the Human Resources department at SouthCentral Foundation (which in this case consisted of Ms. McIntire together with Ms. Ogle), decided to recommend termination of Dr. Lombrano's memorandum of agreement. McIntire Dep. at pages 114, 169, 170. Ms. McIntire admitted that she could have recommended progressive discipline for Dr. Lombrano but chose not to do so. McIntire Dep. at page 115-116. Ms. McIntire conceded that Dr. Lombrano had received many positive evaluations. McIntire Dep. at pages 156-157. However, Ms. McIntire stated that she concluded that progressive discipline was not warranted based on Dr. Lombrano's failure to be forthcoming about the citation. McIntire Dep. at pages 116, 127.

Ms. McIntire further clarified that four factors influenced her decision to recommend Dr. Lombrano's termination. First, the criminal citation which she learned about from Captain Wanca. Second, Dr. Lombrano's alleged ripping up of the citation, which Ms. McIntire also learned about from Captain Wanca. Third, Dr. Lombrano's alleged failure to self-report the citation. Fourth, and finally, the phone call from Colonel Campbell caused Ms. McIntire to have concerns about patient care. McIntire Dep. at pages 162-166, 171, 173-174. While Ms. McIntire stated that the information she had learned from Captain Wanca and Dr. DeBonis caused her to be concerned about Dr. Lombrano's ability to treat patients, she also stated that she only became concerned about Dr. Lombrano's alleged abuses of alcohol and other substances and alleged difficulties treating patients because of what she heard from Colonel Campbell. McIntire Dep. at pages 175-177. Ms. McIntire alleged that the citation which Dr. Lombrano had submitted to SouthCentral Foundation was a copy, and that her notes substantiated that Dr. Lombrano had ripped up the citation and submitted a copy but conceded following cross-examination that there was actually no support in her notes for this version of events. McIntire Dep. at pages 162-163.

19

Ms. McIntire testified that Dr. DeBonis approved her recommendation to terminate Dr. Lombrano's assignment on August 31, 2020. McIntire Dep. at pages 180-182; *see also* McIntire Dep. at page 118. Dr. DeBonis contends, however, that at this stage in the process, her role in Dr. Lombrano's termination was "purely an administrative one." DeBonis Dep. at page 204; *see also* DeBonis Dep. at pages 203, 212, 213.

That same day, Ms. McIntire approved the decision to terminate Dr. Lombrano's assignment in her role as Human Resources director. McIntire Dep. at page 190. While Ms. McIntire could not recall whether a SouthCentral Foundation division vice president reviewed the executive summary the Human Resources department provided regarding Dr. Lombrano, Ms. McIntire did note that the division vice president would have had access to this information only upon request. McIntire Dep. at pages 184-189.  Ms. Tierney approved Ms. McIntire's decision on September 1, 2020. McIntire Dep. at page 190. Ms. April Kyle, Chief Executive Officer of the SouthCentral Foundation, approved terminating Dr. Lombrano's memorandum of agreement that same day. McIntire Dep. at page 198. While Ms. McIntire could not recall whether Ms. Tierney or Ms. Kyle reviewed the Human Resources executive summary for Dr. Lombrano, Ms. McIntire did recall that she had made Ms. Tierney aware of her concerns about Dr. Lombrano; specifically, the criminal citation, the alleged ripping up of the citation, the failure to disclose, and the information learned from Colonel Campbell which Ms. McIntire believed compromised patient care. McIntire Dep. at pages 200-203.

Ms. McIntire authenticated an email which she sent on September 2, 2020, to Ms. Ogle outlining Dr. Lombrano's placement in a non-duty without pay status ("NDWP") pursuant to the immediate termination of her memorandum of agreement with SouthCentral Foundation. McIntire Dep. at pages 209-211. While Ms. McIntire was not certain whether she or Ms. Ogle met with Dr.

Lombrano that day to relay the contents of the email, she is certain that a meeting between one of them and Dr. Lombrano took place. McIntire Dep. at page 211.

During her deposition, Ms. McIntire authenticated a letter dated September 2, 2020, terminating Dr. Lombrano's memorandum of agreement, stating that it was a fair and accurate copy of the letter which was sent to Dr. Lombrano. McIntire Dep. at 217. Ms. McIntire also authenticated a letter dated September 2, 2020, and confirmed that it was a fair and accurate copy of the final letter sent to Dr. Lombrano by Dr. DeBonis regarding Dr. Lombrano's placement on NDWP status. McIntire Dep. at pages 221-223. The letter included the phrase, "This action is being initiated due to your violation of the SCF Background Check Procedure." Ms. McIntire confirmed that this phrase was intended to be inclusive of the previous mentioned factors in the termination of Dr. Lombrano's assignment: 1) Dr. Lombrano's criminal citation which Ms. McIntire learned about from Captain Wanca; 2) Dr. Lombrano's alleged ripping up of the citation, which Ms. McIntire also learned about from Captain Wanca; 3) Dr. Lombrano's alleged failure to self-report the citation; and 4) Ms. McIntire's concerns about patient care, which arose because of the phone call from Colonel Campbell. McIntire Dep. at page 224; *see also* McIntire Dep. at 162-166, 171, 173-174.

V.    **Dr. Lombrano Suffers Damages from Her Terminated Assignment.**

Dr. Lombrano retired on February 1, 2021, and was unable to find full-time work until August 1, 2022. *See* Plaintiff's Response to Defendant's Discovery Requests, Response to Interrogatory No. 9. In the meantime, Dr. Lombrano had to drive approximately 60 miles round trip from her home to work part-time, 2 days a week, at the private practice of Dr. Matt Monaco. *See id.* When Dr. Lombrano worked with Dr. Monaco, she earned an estimated $10,000 to $15,000 per week. *Id.*

21

In April of 2021, Dr. DeBonis contacted Karen McIntire to let her know that Dr. Lombrano was interested in returning to SouthCentral Foundation. DeBonis Dep. at pages 233-237. Ms. McIntire did not believe when she received Dr. DeBonis' email that it was possible for Dr. Lombrano to come back and work at SouthCentral Foundation. McIntire Dep. at 239-242.

Currently, Dr. Lombrano works at Carolina Centers for Oral and Facial Surgery, 160 Turnberry Way, Pinehurst, North Carolina, since August 1, 2022. *See* Plaintiff's Response to Defendant's Discovery Requests, Response to Interrogatory No. 9. Her current position is as an oral surgeon. *See id.* In this role, Dr. Lombrano's average annual compensation over the past three years has been $212,121.85.[3] Dr. Lombrano had difficulty finding work in Alaska following the termination of her assignment at SouthCentral Foundation and incurred significant moving expenses uprooting her life to North Carolina.

Dr. Lombrano's full time compensation at SouthCentral Foundation as a PHS officer was approximately $207,178.00. Tax Documents at page 50. However, Dr. Crossett testified that, based on his experience recruiting at SouthCentral Foundation in his role as Dental Director, the gap in compensation between a tribal hire and a PHS officer in the specialty of oral maxillofacial surgeon was approximately $180,000.00 to 200,000.00 per year, in the tribal hire's favor. Crossett Dep. at pages 21-27. Dr. Crossett testified that he believed if she had been hired as a tribal hire following retirement from the PHS by SouthCentral Foundation, the difference in Dr. Lombrano's compensation would have been "close to that $200,000 mark" – that is, $200,000.00 more than she had been earning as a PHS officer. Crossett Dep. at page 28. Payroll data obtained from

---

[3] Dr. Lombrano earned $117,696 in 2022, $396,945 in 2023, and $121,724.54 in 2024, for a three year average of $212,121.85. Tax Documents at page 133 (marked as "DRS FARRELL FARRELL NALE COOK KAPITAN"), 147, 197 (marked as "DRS FARRELL FARRELL NALE"), 203 (marked as "DRS Farrell Farrell NALE Cook Kapitan").

SouthCentral Foundation during discovery established that if Dr. Lombrano had stayed on as a tribal hire following her retirement from the PHS, she could have expected to earn around $493,483.26 per annum, and perhaps much more than that, as a full time oral maxillofacial surgeon from February 2021 until the present. *See* ECF No. 39-11 ("Payroll Records").[4]

On or about October 1, 2022, Providence Alaska Medical Center declined to renew their contract with Southpointe Surgical Assist. Crabtree Aff., ¶78. Mr. Crabtree believes, based on his conversations with roughly a dozen doctors at Providence Alaska Medical Center, that information regarding the circumstances of the termination of Dr. Lombrano's assignment at SouthCentral Foundation played a decisive role in Providence Alaska Medical Center's decision not to renew. Crabtree Aff., ¶¶79-82. With the loss of this contract, Southpointe Surgical Assist was no longer viable. Crabtree Aff., ¶85.

Dr. Lombrano's cross country move also disrupted her ability to work with Dr. Monaco. While in Alaska, Dr. Lombrano had earned $293,174 in 2022 from practicing with Dr. Monaco. This fell to $67,384.84 in 2024. Tax Documents at 136, 205.

## STATEMENT OF THE LAW

**I.     Federal Rule of Civil Procedure 56 – Motions for Summary Judgment.**

Under Federal Rule of Civil Procedure Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Rule 56(c) thus "mandates the entry of summary judgment, after adequate time for

---

[4] Figure of $493,483.26 per annum is based on the average compensation received by all oral maxillofacial surgeons who worked a minimum of 800 hours per annum at SouthCentral Foundation from 2018 to 2023.

discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* A party seeking summary judgment bears "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact." *Id.,* quoting Fed. R. Civ. Pro. 56(c).

## II.    Privacy Act Claims Generally.

Privacy Act claims for monetary damages based on improper disclosure have four elements: 1) the disclosed information is a record contained within a system of records; 2) the agency improperly disclosed the information; 3) the disclosure was willful or intentional; and 4) the disclosure adversely affected the plaintiff. *Doe v. U.S. Department of Justice*, 660 F. Supp. 2d 31, 44–45 (D.D.C. 2009), citing *Chambers v. U.S. Dep't of Interior,* 568 F.3d 998, 1006 (D.C. Cir. 2009).

## ARGUMENT

Dr. Lombrano is entitled to summary judgment because there is no genuine issue as to any material fact and she is entitled to a judgment as a matter of law. *Celotex Corp.,* 477 U.S. at 322. The Air Force disclosed information about Dr. Lombrano contained within a system of records. *See Doe v. DOJ*, 660 F. Supp. 2d at 44–45. The Air Force's disclosure of Dr. Lombrano's information was improper. *See id.* The Air Force's disclosure of Dr. Lombrano's information was willful and intentional. *See id.* And the Air Force's disclosure of Dr. Lombrano's information has adversely impacted Dr. Lombrano. *See id.* Having met all four required elements of a Privacy Act claim, Dr. Lombrano is entitled to summary judgment. *See id; see* Fed. R. Civ. Pro. 56(c).

**I.    The Air Force Disclosed Information About Dr. Lombrano Contained Within a System of Records.**

A Privacy Act plaintiff must show that the disclosed information is a record within a system of records. *See Doe v. DOJ*, 660 F. Supp. 2d at 44–45. Under the Privacy Act, a "system of records" is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). The D.C. Circuit has defined two criteria for information to be a "record" within the meaning of the Privacy Act: 1) "the information must be 'about' an individual," and 2) "the information must contain the individual's name or identifying particular." *Tobey v. NLRB,* 40 F.3d 469, 471 (D.C. Cir. 1994).

Here, Dr. Lombrano has identified two records maintained within a system of records which were disclosed by the Air Force. First is the treatment note signed by Colonel Campbell on August 12, 2020. Campbell Dep. at pages 127-131. Colonel Campbell indicated that this treatment note was one of many treatment notes which she prepared not only when treating Dr. Lombrano but in the course of her work as a physician in the Air Force. *See* Campbell Dep. at pages 42-45, 65-66, 127-131. In this note, Colonel Campbell indicated that Dr. Lombrano had recently been "drinking excessively," had "put a loaded gun in her mouth," and had been "using [her] self-driving car while she has a cocktail drinking to black out." Campbell Dep. at page 131, 133, 141. The second record was a citation which Dr. Lombrano received on August 11, 2020, for possession of THC gummy bears at JBER. *See* Citation. Both records thus contained information "about" Dr. Lombrano, as well as her name. *See Tobey,* 40 F.3d at 471. Dr. Lombrano therefore has satisfied the first element of a Privacy Act claim by showing that the disclosed information is a record within a system of records. *See Doe v. DOJ*, 660 F. Supp. 2d at 44–45.

## II.     The Air Force's Disclosure of Dr. Lombrano's Information Was Improper.

A Privacy Act plaintiff must also show that the disclosure of the information by the agency was improper. *See Doe v. DOJ*, 660 F. Supp. 2d at 44–45. As mentioned *supra,* under the Privacy Act, a "system of records" is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). Courts have derived from this definition the so-called "retrieval rule," which holds that "the Privacy Act only covers disclosures of information which was either directly or indirectly retrieved from a system of records." *Cloonan v. Holder*, 768 F. Supp. 2d 154, 164 (D.D.C. 2011) (quoting *Doe v. U.S. Dep't of Treasury*, 706 F. Supp. 2d 1, 6 (D.D.C. 2009)).

The disclosure of information derived solely from independent sources is not prohibited by the Privacy Act, even though identical information may be contained in a system of records. *See Doe v. U.S. Dep't of Treasury*, 706 F. Supp. 2d at 6, quoting *Fisher v. Nat'l Institutes of Health*, 934 F.Supp. 464, 473 (D.D.C.1996). If a disclosing official "knew or had reason to believe" that disclosed information might also be found in a protected record, a disclosure is not improper under the Privacy Act if "the disclosing official obtained the information disclosed from sources not covered by the Privacy Act, such as the disclosing official's personal knowledge." *Doe v. Dep't of Treasury*, 706 F. Supp. 2d at 6. This is called the retrieval rule. Retrieval of a protected record may be, however, be inferred by circumstantial evidence. *See Doe v. U.S. Postal Service,* 317 F.3d 339, 342, 343 (D.C. Cir. 2003).

There is also a limited exception to the retrieval rule known as the *Bartel* exception. *Bartel v. Fed. Aviation Admin.*, 725 F.2d at 1409, 1411 (D.C. Cir. 1984), cited favorably by *Pilon v. U.S. Dep't of Justice,* 73 F.3d 1111, 1118 (D.C. Cir. 1996). Under the *Bartel* exception, an agency cannot evade liability under the Privacy Act simply because an agency official or employee

26

discloses information that he or she only knows because of the official or employee's role in creating or maintaining a protected record, even if the official or employee did not actually consult the protected record prior to making the disclosure. *See Pilon,* 73 F.3d at 1118 (Privacy Act does not prevent agency liability "when an official disclose[s] his personal recollection of an investigation that he had instituted, despite the fact that he may not have reviewed the actual investigatory record before doing so"); *see also Bartel,* 725 F.2d at 1411 ("[I]t would hardly seem an intolerable burden to restrict an agency official's discretion to disclose information in a record that he may not have read but that he had a primary role in creating and using, where it was because of that record-related role that he acquired the information in the first place.")

Here, both Dr. Lombrano's August 11, 2020, citation and her August 12, 2020, treatment note prepared by Colonel Campbell were improperly disclosed. First, on August 12, 2020, a JBER security police officer informed Captain Wanca that Dr. Lombrano had been discovered with drugs on base and that charges would be filed. The officer further informed Captain Wanca that Dr. Lombrano had been issued a citation. Wanca Dep. at pages 20, 22, 24, 33-34; *see also* Wanca Dep. at page 86. Captain Wanca informed Ms. McIntire about her conversation with the JBER security police officer. Wanca Dep. at pages 44, 45. Ms. McIntire confirmed that this conversation took place, specifically mentioning the citation. McIntire Dep. at pages 32-37; *see also* McIntire Dep. at pages 125-134. On August 17, 2020, Captain Wanca spoke to the same JBER security police officer who had called her on August 12, 2020. Wanca Dep. at page 87. In that conversation, the officer divulged even more details regarding the citation, telling Captain Wanca that Dr. Lombrano had "been charged with a federal criminal violation of 21 USC, Section 844, simple possession. These charges are being brought before a federal magistrate in a court appearance on 10 November 2020 at 2 p.m." Wanca Dep. at page 88.

27

Second, Colonel Campbell shared information from Dr. Lombrano's August 12, 2020, treatment note with Dr. Abby DeBonis and SouthCentral Foundation personnel. Colonel Campbell informed Dr. DeBonis "that she [Dr. Lombrano] was at risk of harming herself; that she had a serious alcohol problem; and that she really wasn't mentally stable; and I [Colonel Campbell] had significant concerns about her [Dr. Lombrano]." Campbell Dep. at pages 90, 91.   All of this information came from Colonel Campbell's August 12, 2020, treatment note. *See* Campbell Dep. at page 131, 133, 141 (in the note, Colonel Campbell indicates that Dr. Lombrano had recently been "drinking excessively," had "put a loaded gun in her mouth," and had been "using [her] self-driving car while she has a cocktail drinking to black out.") Dr. DeBonis independently corroborated that this conversation took place. DeBonis Dep. at pages 78-80-83, 84, 85, 86.

Colonel Campbell later spoke with Ms. McIntire, Captain Wanca, and Ms. Aregood. McIntire Dep. at pages 39-42, 44-47. Here again, Colonel Campbell shared information from Dr. Lombrano's August 12, 2020, treatment note in violation of the Privacy Act. During the phone call, Colonel Campbell told Ms. McIntire, Captain Wanca, and Ms. Aregood that Dr. Lombrano had a "pretty significant" alcohol use problem, that Colonel Campbell was concerned about her returning to treat patients at SouthCentral Foundation, that Colonel Campbell had been encouraged to contact Dr. Lombrano's licensing board, that Dr. Lombrano was resistant to seeking treatment, that Mr. Crabtree had told Colonel Campbell that Dr. Lombrano used marijuana and other drugs on a regular basis, that Mr. Crabtree had told Colonel Campbell that Dr. Lombrano lost consciousness most nights, that Colonel Campbell did not think that Dr. Lombrano would be ready to begin seeing patients again when she finished treatment, and that JBER was hoping to transfer Dr. Lombrano to the inpatient unit. McIntire Dep. at pages 48-66, 100-101, 174-176. Much if not

28

all of this information was in some way based off of Colonel Campbell's August 12, 2020, treatment note for Dr. Lombrano. *See* Campbell Dep. at page 131, 133, 141.

Both Dr. Lombrano's August 11, 2020, citation and her August 12, 2020, treatment note prepared by Colonel Campbell fall within the *Bartel* exception: the person who created Dr. Lombrano's protected record subsequently disclosed it. *See Pilon,* 73 F.3d at 1118; *Bartel,* 725 F.2d at 1411; Wanca Dep. at pages 20, 22, 24, 33-34, 86; Campbell Dep. at pages 90, 91, 131, 133, 141. The Air Force thus cannot claim that the disclosing officials "obtained the information disclosed from sources not covered by the Privacy Act, such as the disclosing official's personal knowledge" and bar Dr. Lombrano from meeting this element. *See Doe v. Dep't of Treasury*, 706 F. Supp. 2d at 6.

Nor was the disclosure of Dr. Lombrano's information proper. While Colonel Campbell stated that she relied on Department of Defense regulations when deciding to disclose the information in Dr. Lombrano's August 12, 2020, treatment note, PHS officers such as Dr. Lombrano are not covered by Department of Defense regulations. 42 U.S.C. § 202 ("The Public Health Service in the Department of Health and Human Services shall be administered by the Assistant Secretary for Health under the supervision and direction of the Secretary"); *see* Campbell Dep. at pages 106-108, 111-113. Even if such regulations permitted Colonel Campbell to disclose information from Dr. Lombrano's treatment note – they do not – Colonel Campbell was still, by her own admission, required to make only the minimum necessary disclosures. *See* Campbell Dep. at pages 106-108, 111-113. Colonel Campbell plainly did not do this. *See, e.g.,* McIntire Dep. at pages 48-66, 100-101, 174-176.

For all these reasons, Dr. Lombrano has satisfied the second element of a Privacy Act claim by showing that the disclosure was improper. *See Doe v. DOJ*, 660 F. Supp. 2d at 44–45.

### III. The Air Force's Disclosure of Dr. Lombrano's Information Was Willful and Intentional.

To satisfy the third element of a Privacy Act claim, a plaintiff must show that the disclosure of the information by the agency was "willful and intentional." 5 U.S.C. § 552a(g)(4); *see Doe v. DOJ*, 660 F. Supp. 2d at 44–45. Not "every affirmative or negligent action that might be said technically to violate the Privacy Act's provisions" leads to agency liability. *Albright v. United States*, 732 F.2d 181, 189 (D.C. Cir. 1984). And when assessing the third element of the Privacy Act, "the words 'intentional' and 'willful'… do not have their vernacular meanings." *White v. Office of Pers. Mgmt.*, 840 F.2d 85, 87 (D.C. Cir. 1988). Rather, an agency is only liable under the Privacy Act when the agency either "act[s] in a grossly negligent fashion, acting without grounds for believing its actions to be lawful, or by flagrantly disregarding others' rights under the Act." *Doe v. U.S. Dept. of Labor*, 451 F.Supp.2d 156, 176 (D.D.C. 2006), citing *Albright,* 732 F.2d at 189. In *Dong v. Smithsonian Inst.,* 943 F.Supp. 69, 73 (D.D.C.1996), reversed on other grounds, 125 F.3d 877 (D.C. Cir. 1997), this Court held that the defendant's disclosures were intentional and willful when defendant agency officials knew they were subject to the Privacy Act yet "chose to ignore the law" in a way which "constitute[d] reckless disregard for the Privacy Act rights" of agency staff. By contrast, in *Doe v. U.S. Dept. of Labor,* 451 F.Supp.2d at 177-178, this Court held that the agency was not liable because the question of whether a certain disclosure was routine use within the meaning of the Privacy Act had not yet been definitively settled.

Here, both the JBER security police officer and Colonel Campbell acted "in a grossly negligent fashion…without grounds for believing [their] actions to be lawful, or…flagrantly disregard[ed]" Dr. Lombrano's rights under the Privacy Act. *Doe v. U.S. Dept. of Labor*, 451 F.Supp.2d at 176. Both disclosures were the result of intentional actions, not inadvertence, by the disclosing agent. *See, e.g.,* Wanca Dep. at pages 20, 22, 24, 33-34, 86; Crabtree Aff., ¶35. As stated

*supra,* PHS officers are not covered by Department of Defense regulations. 42 U.S.C. § 202. Both the JBER security police officer and Colonel Campbell were specifically informed regarding Dr. Lombrano's status as a PHS officer, yet chose to disclose information from Dr. Lombrano's August 11, 2020, citation and August 12, 2020, treatment note anyway.

During his August 12, 2020, conversation with Captain Wanca, Captain Wanca informed the JBER security police officer that Dr. Lombrano was a PHS officer who was not subject to the Uniform Code of Military Justice. Wanca Dep. at pages 25, 34, 35. Yet the JBER security police offer disclosed details of the August 11, 2020, citation which Dr. Lombrano had received anyway. Wanca Dep. at pages 20, 22, 24, 33-34, 86. Not only that, but on August 17, 2020, the JBER security police officer contacted Captain Wanca again to disclose more information from Dr. Lombrano's citation. Wanca Dep. at page 88 (JBER security police offer discloses that Dr. Lombrano had "been charged with a federal criminal violation of 21 USC, Section 844, simple possession. These charges are being brought before a federal magistrate in a court appearance on 10 November 2020 at 2 p.m.") Captain Wanca did not recall asking the JBER security police officer to call her again. Wanca Dep. at pages 88, 89. During this August 17, 2020, call, the JBER security police officer stated that Dr. Lombrano "appeared to be out of control, refused to sign the citation and ripped up her portion" of the citation. Wanca Dep. at page 89. The JBER Security Police Officer's actions were therefore "grossly negligent", "without grounds for believing [his] actions to be lawful," or "flagrantly disregard[ed]" Dr. Lombrano's rights under the Privacy Act. *Doe v. U.S. Dept. of Labor*, 451 F.Supp.2d at 176.

Colonel Campbell was also aware of Dr. Lombrano's status as a PHS officer. During her conversation with Mr. Crabtree, Mr. Crabtree specifically informed Colonel Campbell that Dr. Lombrano was a commissioned officer in the PHS. Crabtree Aff., ¶36. Despite this knowledge,

Colonel Campbell nonetheless informed SouthCentral Foundation personnel about information contained within Dr. Lombrano's August 12, 2020, treatment note. *See* McIntire Dep. at pages 48-66, 100-101, 174-176. Colonel Campbell's actions too were therefore "grossly negligent", "without grounds for believing [her] actions to be lawful," or "flagrantly disregard[ed]" Dr. Lombrano's rights under the Privacy Act. *Doe v. U.S. Dept. of Labor*, 451 F.Supp.2d at 176.

As in *Dong,* the disclosures by the JBER security police officer and Colonel Campbell were intentional and willful because the JBER security police officer and Colonel Campbell knew or should have known they were subject to the Privacy Act yet "chose to ignore the law" in a way which "constitute[d] reckless disregard for the Privacy Act rights" of Dr. Lombrano. 943 F.Supp. at 73; *compare with Doe v. U.S. Dept. of Labor,* 451 F.Supp.2d at 177-178 (whether PHS officers are covered by Department of Defense regulations definitively settled under 42 U.S.C. § 202). For all these reasons, Dr. Lombrano has therefore satisfied the third element of a Privacy Act claim, showing that the disclosure of the information by the agency was "willful and intentional." 5 U.S.C. § 552a(g)(4); *see Doe v. DOJ*, 660 F. Supp. 2d at 44–45.

IV.     **The Air Force's Disclosure of Dr. Lombrano's Information Has Adversely Impacted Dr. Lombrano.**

The Privacy Act's final element requires a plaintiff to show that the disclosure of the information by the agency adversely impacted the plaintiff. *See Doe v. DOJ*, 660 F. Supp. 2d at 44–45. This requires the plaintiff to show "actual damages" connected to the adverse effect to "qualify" under the Act. *Doe v. Chao*, 540 U.S. 614, 620–27 (2004). A plaintiff must therefore establish not only that she "was adversely affected by the improper disclosure, but also that [she] suffered 'some harm for which damages can reasonably be assessed." *Mulhern v. Gates*, 525 F.Supp.2d 174, 181–82 (D.D.C.2007), quoting *Doe v. Chao*, 540 U.S. at 621. *See also Fed.*

*Aviation Admin. v. Cooper,* 566 U.S. 284, 298 (2012) (holding that actual damages in the Privacy Act means "special damages for proven pecuniary loss.")

Here, Dr. Lombrano has suffered three distinct harms for which damages can reasonably be assessed. *Doe v. Chao*, 540 U.S. at 621. First, Dr. Lombrano lost the opportunity to continue working at SouthCentral Foundation as a tribal hire following her retirement from the PHS. *See* Crabtree Aff., ¶¶68-70; Crossett Dep. at page 10, 12, 13; DeBonis Dep. at pages 41-44. Dr. Lombrano incurred significant pecuniary harm as a result of her inability to become a tribal hire following her departure from the PHS. Dr. Lombrano's full-time compensation at SouthCentral Foundation as a PHS officer was approximately $207,178.00. Tax Documents at page 50. Dr. Crossett testified that in his experience, Dr. Lombrano would have been earning close to $200,000 more per annum as a tribal hire than as a PHS officer. *See* Crossett Dep. at pages 21-28. However, payroll data obtained from SouthCentral Foundation during discovery indicates that if Dr. Lombrano had stayed on as a tribal hire following her retirement from the PHS, she could have expected to earn around $493,483.26 per annum as a full time oral maxillofacial surgeon from February 2021 until the present. *See* Payroll Records.[5] The difference between this figure and Dr. Lombrano's PHS salary is $286,305.26 per annum.

Without the improper disclosure of information from Dr. Lombrano's protected records by the JBER security police officer and Colonel Campbell, Dr. Lombrano very likely would have been able to become a tribal hire. Dr. Crossett testified that while not all PHS officers working at SouthCentral Foundation become tribal hires upon retirement from the PHS, he was "95 percent" confident that Dr. Lombrano would become tribal hire, owing to "a long-working relationship with

---

[5] Figure of $493,483.26 per annum is based on the average compensation received by all oral maxillofacial surgeons who worked a minimum of 800 hours per annum at SouthCentral Foundation from 2018 to 2023.

Dr. Lombrano" and her "skill set and her empathy for her patients." Crossett Dep., at pages 16, 18. Only following Colonel Campbell's disclosures did Dr. DeBonis and Ms. McIntire develop concerns about Dr. Lombrano's ability to treat her patients. DeBonis Dep. at pages 99, 105; McIntire Dep. at pages 23-26. These concerns persisted even though a final quality review on August 28, 2020, of the one patient whom Dr. Lombrano had seen on August 11, 2020, concluded that there were no indications that Dr. Lombrano had not met the appropriate standard of care during her treatment of this patient. *See* DeBonis Dep. at pages 194-197. Ms. McIntire indicated that four factors influenced her decision to recommend Dr. Lombrano's termination. First, the criminal citation which she learned about from Captain Wanca. Second, Dr. Lombrano's alleged ripping up of the citation, which Ms. McIntire also learned about from Captain Wanca. Third, Dr. Lombrano's alleged failure to self-report the citation. Fourth, and finally, the phone call from Colonel Campbell caused Ms. McIntire to have concerns about patient care. McIntire Dep. at pages 162-166, 171, 173-174. While Ms. McIntire stated that the information she had learned from Captain Wanca and Dr. DeBonis caused her to be concerned about Dr. Lombrano's ability to treat patients, she also stated that she only became concerned about Dr. Lombrano's alleged abuses of alcohol and other substances and alleged difficulties treating patients because of what she heard from Colonel Campbell. McIntire Dep. at pages 175-177. In April of 2021, Dr. DeBonis contacted Karen McIntire to let her know that Dr. Lombrano was interested in returning to SouthCentral Foundation. DeBonis Dep. at pages 233-237. But Ms. McIntire did not believe when she received Dr. DeBonis' email that it was possible for Dr. Lombrano to come back and work at SouthCentral Foundation. McIntire Dep. at 239-242. As a result of her inability to become a tribal hire, Dr. Lombrano has lost $286,305.26 per annum over the past four years, or a total of approximately $1,145,221.04.

34

Second, Dr. Lombrano suffered harm because Southpointe Surgical Assist, a company founded by Dr. Lombrano together with her husband, Mr. Crabtree, lost a contract with Providence Alaska Medical Center. This contract provided that that Providence Alaska Medical Center would pay Southpointe Surgical Assist "a daily rate of $2250 per day for call coverage provided hereunder." Contract at page 11. Mr. Crabtree estimated this contract paid himself and Dr. Lombrano approximately $821,250.00 annually. Crabtree Aff., ¶¶71-77. For Southpointe Surgical Assist, Dr. Lombrano and Mr. Crabtree reported $338,680 in qualified service income and $524,911.00 in Section 199A W-2 wages in 2019, $454,164 in ordinary income and $216,918 in W-2 wages in 2021, and $260,402 in ordinary income and $46,667 in W-2 wages in 2022. In 2020, Dr. Lombrano and Mr. Crabtree reported $429,116 in wages, salaries, and tips, as well as $574,738 in other income. A substantial portion of both sources of income was the contract with Providence Alaska Medical Center. *See* Tax Documents at pages 34, 67, 77, 78, 117, 118.

Information regarding the circumstances of the termination of Dr. Lombrano's assignment at SouthCentral Foundation likely played a decisive role in Providence Alaska Medical Center's decision not to renew the contract on October 1, 2022. Crabtree Aff., ¶¶79-82. The contract between Southpointe Surgical Assist and Providence Alaska Medical Center required Dr. Lombrano to abide by "the Roman Catholic moral tradition," notify Providence Alaska Medical Center in the event of her termination from SouthCentral Foundation, and abide by Providence Alaska Medical Center's substance abuse policy on pain of removal for failure to do so. *See* Contract at page 2, paragraph 1.1.1.F; page 4, paragraph 2.2.1; and page 6, paragraph 9.1. With the loss of this contract, Southpointe Surgical Assist was no longer viable. Crabtree Aff., ¶85. The lost income from this contract cost Dr. Lombrano approximately $410,625.00 per annum over the past three years, for a total of $ 1,231,875.

35

Third, because of Dr. Lombrano's loss of reputation within the Alaskan medical community, she had to move across the country to find her current role at Carolina Centers for Oral and Facial Surgery. *See* Plaintiff's Response to Defendant's Discovery Requests, Response to Interrogatory No. 9. This move disrupted Dr. Lombrano's ability to work with Dr. Monaco. While in Alaska, Dr. Lombrano had earned $293,174.00 in 2022 from practicing with Dr. Monaco. Although Dr. Lombrano still practices with Dr. Monaco, obvious logistical challenges drove her earnings downward to $67,384.84 in 2024. Tax Documents at pages 136, 205. The gap between what Dr. Lombrano could have earned at Dr. Monaco's practice over the past two years and what she actually earned is thus approximately $225,789.16 per annum, for a total of $451,578.32.

All told, Dr. Lombrano has incurred $2,828,674.36 in damages over the past four and a half years as a result of the Air Force's improper disclosures. Moreover, the circumstances which led to Dr. Lombrano's diminished earnings are continuing to adversely affect Dr. Lombrano's earnings in the amount of $922,719.42 per annum. Dr. Lombrano is currently 56 years old; if she works until she is 65, this means that she will have lost an additional $8,304,474.78, for a total of $11,133,149.14.

For all these reasons, Dr. Lombrano has shown that the disclosure of the information by the agency adversely impacted her. *See Doe v. DOJ*, 660 F. Supp. 2d at 44–45.

## CONCLUSION

As demonstrated *supra,* there is no issue regarding any material fact in this case. The Air Force disclosed information about Dr. Lombrano contained within a system of records. The Air Force's disclosure of Dr. Lombrano's information was improper, willful and intentional, and has adversely impacted Dr. Lombrano. Having met all four required elements of a Privacy Act claim, Dr. Lombrano is entitled to a judgment as a matter of law.

A proposed order and certificate of service are attached.

36

Dated: March 7, 2025.

Respectfully submitted,

*/s/ Dylan Thayer*
 Dylan Thayer
DC Bar No. 90015821

*/s/David P. Sheldon*

David P. Sheldon
DC Bar No. 446039
Law Offices of David P. Sheldon, P.L.L.C.
100 M Street, S.E., Suite 600
Washington, DC  20003
Tel: 202.546.9575
Fax: 202.546.0135

*Attorneys for Plaintiff*

37

## <u>CERTIFICATE OF SERVICE</u>

I, undersigned, hereby certify that a true and correct copy of the foregoing was filed electronically with the Court's ECF electronic filing system and delivered electronically to counsel of record for the Defendant, listed below, on March 7, 2025:

Dedra S. Curteman
Dedra.Curteman@usdoj.gov                                    /s/*Dylan Thayer*
                                                                    Dylan Thayer