**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

JENNIFER L. LOMBRANO,

    *Plaintiff*,

    v.

DEPARTMENT OF THE AIR FORCE,

    *Defendant*.

No. 21-cv-00872 (DLF)

---

**MEMORANDUM OPINION**

Jennifer Lombrano brings this action against the Department of the Air Force under the Privacy Act, 5 U.S.C. § 552a *et seq.* Lombrano alleges that the Air Force impermissibly disclosed to her workplace information from her medical records and a criminal citation, resulting in both her termination from that workplace and her early retirement from a related government agency. Before the Court are Lombrano's Motion for Summary Judgment, Dkt. 39, and the Air Force's Cross-Motion for Summary Judgment, Dkt. 44. For the reasons that follow, the Court will deny Lombrano's motion and grant the Air Force's motion in part.

**I.    BACKGROUND**

**A.  Factual Background**

At the time of the events at issue in this case, Lombrano was a commissioned officer in the United States Public Health Service working as an oral and maxillofacial surgeon at the SouthCentral Foundation in Anchorage, Alaska. Pl.'s Statement of Facts (Pl.'s SOF) ¶ 4, Dkt. 39-2; Def.'s Statement of Facts (Def.'s SOF) ¶¶ 1–2, Dkt. 44-12. When Lombrano "began experiencing acute mental distress and anxiety" in August 2020, Pl.'s SOF ¶ 12; *see* Def.'s SOF ¶ 4, she and her husband, Will Crabtree, determined that it was in her best interest to seek treatment

at Schick Shadel Hospital, an out-of-state provider located in Burien, Washington, Pl.'s SOF ¶¶ 13–17. On August 11, 2020, Lombrano told her supervisor, Abby DeBonis, that she was not feeling well and asked for DeBonis's permission to go to United States Air Force Joint Base Elmendorf Richardson (JBER) to seek treatment. *Id.* ¶ 21; *see id.* ¶¶ 18–21; Def.'s SOF ¶¶ 4–5. The purpose of the visit was to obtain a medical clearance to visit Schick Shadel Hospital. Pl.'s SOF ¶ 22; Def.'s SOF ¶¶ 4–5.

Following Lombrano's conversation with DeBonis, Lombrano and Crabtree traveled to JBER. Pl.'s SOF ¶ 23; *see* Def.'s SOF ¶ 5. Lombrano told staff at JBER's outpatient clinic that she needed to obtain a medical clearance to seek out-of-state treatment for alcohol use. Def.'s SOF ¶ 6. Medical staff informed Lombrano that, due to her history of cardiac ablation, they wanted her to stay at JBER for an overnight medical evaluation. Pl.'s SOF ¶ 25. Medical staff further represented that, although JBER's outpatient clinic was full, they could treat Lombrano in the behavioral health unit. *See id.* ¶¶ 27–29; Def.'s SOF ¶ 6.

When Lombrano and Crabtree arrived at the behavioral health unit, a nurse informed them that, even though Lombrano was not a behavioral health patient, she would need to abide by the unit's rules. *See* Pl.'s SOF ¶ 31. Accordingly, Lombrano was taken to a room and subject to a full-body search. Def.'s SOF ¶ 10. Staff also confiscated, searched, and inventoried Lombrano's belongings. Pl.'s SOF ¶ 35. During that search, staff seized three two-milligram gummy bears infused with THC, the metabolite for marijuana. *Id.* ¶ 36; Def.'s SOF ¶ 11. Lombrano told JBER law enforcement that the gummy bears did not belong to her, Pl.'s SOF ¶ 37, but was issued a citation for possessing drugs on base, *see id.* ¶ 79.

After Lombrano was admitted to the JBER behavioral health unit, she met with staff psychiatrist Colonel Christine Campbell. *Id.* ¶ 38; Def.'s SOF ¶¶ 13–14. During their initial

conversation, Lombrano told Campbell that she had a history of getting help for psychiatric issues and had been experiencing stress. Pl.'s SOF ¶ 39; Def.'s SOF ¶ 20. Lombrano further represented that she wanted to seek treatment privately and in her own way. Pl.'s SOF ¶¶ 39–40; Def.'s SOF ¶¶ 20–21. Campbell asked Lombrano if she was experiencing drug and alcohol dependency, and Lombrano replied that she was not. Pl.'s SOF ¶ 42; Def.'s SOF ¶¶ 23–24. Campbell suspected that Lombrano was being untruthful and minimizing her use. Pl.'s SOF ¶ 42; Def.'s SOF ¶ 24. She was also aware that staff had found THC gummies in Lombrano's belongings. Pl.'s SOF ¶ 59; Def.'s SOF ¶ 28. And she learned through a conversation with Crabtree that Lombrano used drugs, drank excessively, and had previously attempted suicide. Def.'s SOF ¶¶ 32–35. Campbell was concerned about Lombrano's history of impulse control disorders, post-traumatic stress disorders, and other psychological problems, *id.* ¶ 25, and worried that Lombrano had a risk of suicide, *id.* ¶ 29. She also worried that, as a practicing medical provider, Lombrano was putting patients at risk. *Id.* ¶ 36.

Campbell had multiple conversations with Lombrano over the course of treating her and made treatment notes of some—but not all—of those conversations. *Id.* ¶ 31; *see* Pl.'s SOF ¶ 43. In a note dated August 12, 2020, Campbell wrote that Lombrano had been "drinking excessively," Pl.'s SOF ¶ 44, had "put a loaded gun in her mouth," *id.* ¶ 45, and had been "using her self-driving car while she has a cocktail drinking to black out," *id.* ¶ 46 (citation modified).

Based on her evaluation of and interactions with Lombrano, Campbell decided to contact SouthCentral. *Id.* ¶ 63; Def.'s SOF ¶ 37. She contacted DeBonis and informed her that Lombrano "was at risk of harming herself," "had a serious alcohol problem," and "wasn't mentally stable." Pl.'s SOF ¶ 63; *see id.* ¶ 66; Def.'s SOF ¶ 43. Campbell further conveyed that she had "significant concerns" about Lombrano, Pl.'s SOF ¶ 63; Def.'s SOF ¶ 43, and may also have disclosed that

3

marijuana was found in Lombrano's bag, *see* Pl.'s SOF ¶ 64; Campbell Dep. Tr. 90:21–91:12, Dkt. 39-7. She expressed reservations about Lombrano returning to work, Pl.'s SOF ¶ 68, and her call caused DeBonis to have concerns about Lombrano's ability to treat patients, *id.* ¶ 71.

On August 12, 2020, a member of the JBER security police contacted SouthCentral and informed Captain Martha Wanca, Lombrano's human resource personnel officer, that Lombrano had been issued a citation for possessing drugs on base and that charges would be filed. *See id.* ¶¶ 72–79. Wanca informed Karen McIntire, the Senior Human Resource Director at SouthCentral, about her conversation with the JBER security police officer. *Id.* ¶¶ 83–84, 87.

McIntire subsequently organized a phone call between herself, Campbell, Wanca, and Michelle Aregood, SouthCentral's Director of Quality Assurance. *See id.* ¶¶ 93–94. During this call, Campbell shared that Lombrano "had a pretty significant alcohol use problem, that [she] was concerned about [Lombrano] returning to treat patients at SouthCentral Foundation, that [Campbell] had been encouraged to contact [Lombrano's] licensing board, that [Lombrano] was resistant to seeking treatment, that [Crabtree] had told [Campbell] that [Lombrano] used marijuana and other drugs on a regular basis, that [Crabtree] had told [Campbell] that [Lombrano] lost consciousness most nights, that [Campbell] did not think that [Lombrano] would be ready to begin seeing patients again when she finished treatment, and that JBER was hoping to transfer [Lombrano] to the inpatient unit." *Id.* ¶ 98 (citation modified); *see* McIntire Dep. Tr. 48:8–9, 56:12–17, 57:21–58:11, 100:8–17, Dkt. 39-9. Following the call, McIntire concluded that Lombrano needed substance abuse treatment. Pl.'s SOF ¶ 99.

On August 17, 2020, Wanca received another call from the JBER security police officer. *Id.* ¶ 108. On that call, the officer shared that Lombrano had been "charged with a federal criminal violation of [21 U.S.C. § 844], simple possession" and that she would have a court appearance

before a federal magistrate judge on November 10, 2020. *Id.* ¶ 110 (citation modified). The officer further shared that Lombrano "appeared to be out of control, refused to sign the citation, and ripped up her portion of the citation." *Id.* ¶ 112 (citation modified).

SouthCentral terminated Lombrano on September 2, 2020. *Id.* ¶¶ 135–38; Def.'s SOF ¶ 57. Lombrano ultimately retired from the Public Health Service in February 2021. Pl.'s SOF ¶ 140; Def.'s SOF ¶ 64.

### B. Procedural Background

Lombrano filed suit in this Court on March 31, 2021, alleging that Campbell's disclosures to SouthCentral personnel violated the Privacy Act. Compl., Dkt. 1. Lombrano subsequently amended her complaint, Mot. to Amend Compl., Dkt. 12; August 2, 2021 Minute Order, and the Air Force moved to dismiss, Mot. to Dismiss Amended Compl., Dkt. 14. The Court denied the Air Force's motion on February 9, 2022. Order, Dkt. 18; Mem. Op., Dkt. 19.

On March 4, 2025, the Court granted Lombrano leave to file a Second Amended Complaint incorporating, among other things, a second Privacy Act claim regarding the JBER security police officer's alleged disclosures. March 4, 2025 Minute Order; Second Am. Compl., Dkt. 38.[1] The parties cross-moved for summary judgment. Pl.'s Mot. for Summ. J., Dkt. 39; Mem. in Supp. of Def.'s Opp'n & Cross-Mot. for Summ. J., Dkt. 44.

## II.    LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant

---

[1] Although Lombrano's Second Amended Complaint contains only a single section entitled "Legal Claim," *see* Second Am. Compl. 8–10, the Court will construe the filing as setting forth two separate Privacy Act Claims: one encompassing Campbell's alleged disclosures and one encompassing the JBER security police officer's alleged disclosures.

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one that could affect the outcome of the lawsuit. *Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. In reviewing the record, the Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

A party opposing summary judgment must "substantiate [its allegations] with evidence" that "a reasonable jury could credit in support of each essential element of [its] claims." *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The moving party is entitled to summary judgment if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Fam. Tr. of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (citation modified).

## III.    ANALYSIS

The parties have cross-moved for summary judgment on both of Lombrano's Privacy Act claims.  For the reasons that follow, the Court will grant the Air Force's cross-motion for summary judgment as to Campbell's alleged disclosures but deny both parties' motions as to the JBER security police officer's alleged disclosures.

### A.  The Privacy Act

The Privacy Act "safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records."  *In re OPM Data Sec. Breach Litig.*, 928 F.3d 42, 61–62 (D.C. Cir. 2019) (citation modified).  To that end, the Act "contains a comprehensive and detailed set of requirements for the management of confidential records held by Executive Branch agencies."  *FAA v. Cooper*, 566 U.S. 284, 287 (2012).

As relevant here, the Privacy Act provides that, absent certain exceptions, "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior consent of, the individual to whom the record pertains."  5 U.S.C. § 552a(b).  The Act defines a "record" as "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph."  *Id.* § 552a(a)(4).  The Act defines a "system of records" as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual."  *Id.* § 552a(a)(5).

7

The Privacy Act authorizes a private right of action against agencies that improperly disclose such records. *See id.* § 552a(g)(1)(D). "To unlock the Privacy Act's waiver of sovereign immunity and state a cognizable claim for damages, a plaintiff must allege that (i) the agency 'intentional[ly] or willful[ly]' violated the Act's requirements for protecting the confidentiality of personal records and information; and (ii) she sustained 'actual damages' (iii) 'as a result of' that violation." *In re OPM*, 928 F.3d at 62 (quoting 5 U.S.C. § 552a(g)(4)).

An actionable Privacy Act claim must also satisfy what is known as the "retrieval rule." Under that rule, the challenged disclosure "generally must [have been] the result of someone having actually retrieved the 'record' from [a] 'system of records'; the disclosure of information is not ordinarily a violation merely because the information happen[ed] to be contained in the records." *Armstrong v. Geithner*, 608 F.3d 854, 857 (D.C. Cir. 2010) (citation modified). "Thus, an agency official who discloses information that he or she acquired from non-record sources— such as observation, office emails, discussions with co-workers and the 'rumor mill'—does not violate the Privacy Act in doing so, even if the information disclosed is also contained in agency records." *Cloonan v. Holder*, 768 F. Supp. 2d 154, 164 (D.D.C. 2011); *see Doe v. Dep't of Veterans Affs.*, 519 F.3d 456, 463 (8th Cir. 2008) (explaining that the Act "does not prohibit disclosure of information independently acquired"); *Doe v. Dep't of the Treasury*, 706 F. Supp. 2d 1, 6–7 (D.D.C. 2009) ("Thus, a disclosure rarely implicates the Privacy Act—even if the disclosing official knew or had reason to believe that the information disclosed might also be found in a protected record—so long as the disclosing official obtained the information disclosed from sources not covered by the Privacy Act, such as the disclosing official's personal knowledge." (citation modified)). In this way, the retrieval rule "ensures that the Privacy Act does not create a monastic vow of silence which prohibits governmental employees from telling others what they

saw and heard merely because what they saw or heard may also be the topic of a record in a protective file." *Cloonan*, 768 F. Supp. 2d at 164 (citation modified).

The D.C. Circuit has recognized a "narro[w]" exception to the retrieval rule. *Armstrong*, 608 F.3d at 859. In *Bartel v. Federal Aviation Administration*, 725 F.2d 1403 (D.C. Cir. 1984), Richard Bartel—an employee of the Federal Aviation Administration (FAA)—allegedly improperly accessed agency files pertaining to three FAA personnel, leading Brian Vincent— another employee—to open an investigation. *Id.* at 1405–06. "Documents collected pursuant to that investigation were placed in a Report of Investigation." *Id.* at 1405. After the investigation concluded, "Vincent decided that a letter of reprimand to Bartel was appropriate." *Id.* at 1406; *see id.* at 1405–06. Bartel, however, left his employment with the FAA before "any official adverse action" was taken. *Id.* at 1406. When Vincent later learned that Bartel was seeking reemployment with the FAA, Vincent sent letters to the three individuals whose files Bartel had allegedly improperly accessed, informing them of the investigation and its findings. *See id.* Vincent also told an investigator for another employer to which Bartel had applied that "the FAA was looking into a job-related problem that Bartel had when he left the Administration." *Id.* Bartel challenged Vincent's disclosures as violative of the Privacy Act, and the district court dismissed his claims. *Id.* at 1406–07.

The D.C. Circuit vacated the district court's dismissal. *Id.* at 1405. The court noted that it was not clear "whether Vincent ever examined"—and thus "retrieved"—the Report of Investigation. *Id.* at 1408; *see id.* at 1409 ("We do not know if Vincent ever consulted the file and, if so, when, in relation to the sending of the letters."); *see also id.* at 1411 ("[T]he details of Vincent's precise relationship to the creation and use of the Bartel investigation record are not fully known."). Nevertheless, it rejected the proposition that "all information not 'retrieved' from

a record is 'personal knowledge' falling outside of the Privacy Act's protection." *Id.* at 1409. Instead, the court adopted an exception to the retrieval rule, holding that an agency official violates the Privacy Act when he "uses the government's sophisticated information collecting methods to acquire personal information for inclusion in a record and then discloses that information in an unauthorized fashion without actually physically retrieving it from the record system." *Id.* at 1410 (citation modified); *see id.* at 1409 ("[T]his case demonstrates that an absolute policy of limiting the Act's coverage to information physically retrieved from a record would make little sense in terms of its underlying purpose."). "It would hardly seem an intolerable burden," the court explained, "to restrict an agency official's discretion to disclose information in a record that he may not have read but that he had a primary role in creating and using, where it was because of that record-related role that he acquired the information in the first place." *Id.* at 1411 (citation modified).

The D.C. Circuit, however, explicitly limited the exception it recognized in *Bartel* to the "peculiar set of circumstances" in the case: "disclosure by an agency official of his official determination made on the basis of an investigation which generated a protected personnel record." *Id.* at 1409; *see id.* (limiting holding to "*the factual context of th*[e] *case*"); *id.* at 1408 (referencing "the peculiar circumstances of th[e] case"). And the court has "subsequently declined to extend the exception beyond the *Bartel* facts." *Paige v. DEA*, 665 F.3d 1355, 1361 (D.C. Cir. 2012) (citing *Armstrong*, 608 F.3d at 859–60).

**B. Campbell's Alleged Disclosures of the August 12, 2020 Treatment Note**

Lombrano argues that Campbell violated the Privacy Act by sharing information from her August 12, 2020 treatment note with DeBonis and SouthCentral personnel. *See* Mem. in Supp. of Pl.'s Mot. for Summ. J. 28–29, Dkt. 39-1. She identifies two disclosures: (1) information

10

Campbell shared in her initial conversation with DeBonis; and (2) information Campbell shared during her telephone conversation with McIntire, Wanca, and Aregood. *See id.* Rather than allege that Campbell retrieved the disclosed information from the August 12 treatment note, Lombrano asserts that Campbell's creation of the treatment note and subsequent disclosure of its contents satisfy the *Bartel* exception to the retrieval rule. *See id.* at 29; Pl.'s Reply & Opp'n 7–12, Dkt. 47; *see also Mullane v. DOJ*, 22-cv-725, 2024 WL 3359534, at *9 (D.D.C. July 10, 2024) ("[*Bartel*'s] framework should only be applied when it has first been established that the plaintiff cannot satisfy the retrieval standard." (citation modified)).

The Court disagrees. Campbell's alleged disclosures do not fall within *Bartel*'s "narro[w]" exception. *Armstrong*, 608 F.3d at 859. To start, Campbell neither "ordered [an] investigation" of Lombrano, nor "made a putative determination of wrongdoing based on [an] investigation." *Bartel*, 725 F.2d at 1411; *see Armstrong*, 608 F.3d at 859–60 (noting that the D.C. Circuit "narrowly tethered" the *Bartel* exception "to the facts of that case, in which the disclosing agency employee had ordered the investigation which resulted in the report, made a putative determination of wrongdoing based on the investigation, and disclosed that putative determination in letters purporting to report an official agency determination" (citation modified)). Courts have repeatedly declined to extend *Bartel* to such circumstances. *See, e.g.*, *Paige*, 665 F.3d at 1361 (declining to apply *Bartel* where agency official "did not order the investigation which resulted in the creation of the [record], make a putative determination of wrongdoing based on the investigation, or disclose that putative determination" (citation modified)); *York v. McHugh*, 850 F. Supp. 2d 305, 312–13 (D.D.C. 2012) (*Bartel* "inapplicable" where there was no evidence that the subject records "were compiled as part of a formal investigation" (citation modified)); *Krieger v. DOJ*, 529 F. Supp. 2d 29, 48 (D.D.C. 2008) (*Bartel* "easily distinguishable" where agency official did not

11

disclose information contained within a "record created during the course of an investigation"); *see also Walia v. Holder*, 59 F. Supp. 3d 492, 503–04 (E.D.N.Y. 2014) (*Bartel* "distinguishable" where there was no evidence that agency official "ever initiated or ordered any investigation" of the plaintiff or "composed [the subject record] as part of an investigation").

Nor did Campbell "us[e] the government's sophisticated information collecting methods to acquire personal information for inclusion in a record and then disclos[e] that information in an unauthorized fashion." *Bartel*, 725 F.2d at 1410 (citation modified). Accordingly, this case does not implicate a key concern animating the *Bartel* exception: the ease with which government information gathering mechanisms collect and utilize "vast amounts of personal information." *Id.*; *see Wilborn v. HHS*, 49 F.3d 597, 600–01 (9th Cir. 1995) (reading *Bartel* as applying to circumstances involving the disclosure of information contained in records created using the government's "sophisticated information collecting methods" (citation modified)), *abrogated on other grounds by Doe v. Chao*, 540 U.S. 614 (2004); *see also Doe*, 519 F.3d at 462–63 (distinguishing *Bartel* as presenting "concerns about threats to privacy from misuse of the government's sophisticated systems for collecting and storing personal information"); *Krowitz v. Dep't of Agric.*, 641 F. Supp. 1536, 1544 (W.D. Mich. 1986) ("[T]his is clearly not an instance, as in *Bartel*, where [an agency official] used the government's sophisticated information collecting methods to gain personal information for inclusion in an investigative report which he personally ordered and then disclosed that specific report information in written form without actually retrieving it from the record system.").

This case, moreover, involves circumstances that *Bartel* did not. Campbell learned of the information she disclosed not merely through her role in creating the August 12 treatment note but also through an independent source. *Contrast Bartel*, 725 F.2d at 1411 (rejecting the inference

12

that Vincent learned of the disclosed information through sources other than the formal investigation).  Lombrano asserts that Campbell told DeBonis that Lombrano "was at risk of harming herself" and "had a serious alcohol problem," and that Campbell "had significant concerns about her."  Mem. in Supp. of Pl.'s Mot. for Summ. J. 28.  She further asserts that Campbell divulged additional information to McIntire, Wanca, and Aregood, including that Lombrano "had a 'pretty significant' alcohol use problem"; that Lombrano "used marijuana and other drugs on a regular basis" and "lost consciousness most nights"; and that she did not think that Lombrano "would be ready to begin seeing patients again when she finished treatment."  *Id.*

The information Campbell disclosed to DeBonis, McIntire, Wanca, and Aregood did not simply "c[o]me from" the August 12 treatment note.  *Id.*; *see id.* at 28–29.  Campbell testified that she also learned this information from Crabtree, who spoke to her about Lombrano's alcohol and drug use, as well as her past suicide attempt.  *See, e.g.*, Campbell Dep. 85:7–14 (stating that Crabtree shared that Lombrano drank "the entire day . . . until she passe[d] out" and "used all kinds of drugs" and that "at night he wouldn't sleep because he'd be watching her because she would vomit in her sleep and he was worried that she was going to die"); *id.* at 86:2–87:4 (similar); *id.* at 87:20–21 (representing that Crabtree had concerns regarding a suicide attempt in which Lombrano "was very intoxicated" and "had gotten the gun," threatening to take her life and his).  Because Lombrano does not allege that Campbell documented her conversation with Crabtree in the August 12 treatment note, the conversation constitutes an independent, non-record source of information about Lombrano's alcohol and drug use and risk of self-harm.  Disclosure of information obtained through such a source does not typically violate the Privacy Act, even if the same information is contained within an agency record.  *See Cloonan*, 768 F. Supp. 2d at 164.  And the D.C. Circuit did not in *Bartel* purport to address those circumstances in which an agency official discloses

information learned from both an agency record and a non-record source. *See Bartel*, 725 F.2d at 1411.

The fact that Campbell herself drafted the August 12 treatment note does not alter this analysis. In *Bartel*, "the details of Vincent's precise relationship to the creation and use of the Bartel investigation record [we]re not fully known." *Id.* As such, *Bartel* did not endorse a "scrivener exception" to the retrieval rule. *Doe*, 519 F.3d at 462; *see id.* at 462–63 (rejecting such an exception).

Finally, at least one circuit has explicitly distinguished *Bartel* in a case involving facts analogous to those alleged in this case. In *Doe v. Department of Veterans Affairs*, 519 F.3d 456 (8th Cir. 2008), a patient argued that his physician violated the Privacy Act when the physician disclosed the patient's HIV status to an unauthorized source after recording that status in a treatment note. *Id.* at 459–63. The Eighth Circuit rejected the claim, reasoning that the physician's disclosure did not satisfy the retrieval rule because the physician had acquired the information "directly" from the patient and disclosed it later based on "[p]ersonal knowledge and memories." *Id.* at 463; *see id.* at 461–63. As such, the court concluded that the challenged disclosure did not "resul[t] from a retrieval of the information initially and directly from the record contained in the system of records." *Id.* at 461 (citation modified). The D.C. Circuit later cited *Doe* approvingly in a case finding that the *Bartel* exception did not apply where an agency official acquired the disclosed information from a non-record source. *See Armstrong*, 608 F.3d at 860.

As Lombrano has not alleged facts indicating that Campbell actually retrieved information from the August 12, 2020 treatment note, and because Campbell's alleged disclosures do not fall within *Bartel*'s narrow exception to the retrieval rule, the Court will grant summary judgment to the Air Force on this claim.

**C. JBER Security Police Officer's Alleged Disclosures of the Citation**

Lombrano further alleges that an unnamed JBER security police officer violated the Privacy Act when he disclosed the contents of her drug possession citation to Wanca in phone calls on August 12 and 17, 2020. *See* Mem. in Supp. of Pl.'s Mot. for Summ. J. 27; Pl.'s Reply & Opp'n 5–7.

Lombrano has not carried her burden to demonstrate that "no genuine dispute" exists as to whether the JBER security police officer made an improper disclosure regarding her citation. Fed. R. Civ. P. 56(a). To start, she has not identified the security officer who allegedly made the disclosure, instead offering circumstantial evidence to suggest that the unidentified officer retrieved the citation before disclosing its contents. For example, citing Wanca's testimony, Lombrano notes that the JBER officer disclosed specific information contained in the citation—such as the nature of her charge and the date and time of her scheduled court appearance—which she argues is sufficient to show that the officer read from the citation itself. *See* Pl.'s Reply & Opp'n 5–6 ; *see also Doe*, 706 F. Supp. 2d at 10 ("[T]he timing and substance of the disclosure at issue [can] provide circumstantial evidence of retrieval."). But this evidence is not enough to establish that the disclosure came from a system of records. At the summary judgment stage, "all reasonable inferences" must be drawn "in favor of the nonmoving party." *Reeves*, 530 U.S. at 150. On the existing record, it is reasonable to infer that the unidentified officer obtained the disclosed information from some other non-record source, such as an office email or a discussion with a supervisor. *See Cloonan*, 768 F. Supp. 2d at 164.[2] Because a genuine dispute of material fact

---

[2] Although the Air Force styles its brief as a full, not partial, cross-motion for summary judgment, it has not offered any argument as to why it should prevail on Lombrano's claim regarding the JBER security police officer. And just as Lombrano has failed to overcome the reasonable inference that the JBER officer may have based the disclosure on sources other than the citation,

exists as to whether the JBER security police officer retrieved Lombrano's citation, the Court will deny Lombrano's motion for summary judgment. *Cf. Bartel* 725 F.2d at 1408–09 (concluding that "further development of the facts" was required because the record before the court was "entirely silent" as to whether the disclosing individual had examined the subject record).

### CONCLUSION

For the foregoing reasons, the Court denies Lombrano's Motion for Summary Judgment, Dkt. 39, and grants in part the Air Force's Cross-Motion for Summary Judgment, Dkt. 44.  A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

March 31, 2026

---

the Air Force has not rebutted the reasonable inference that the officer retrieved the citation itself. *See Fam. Tr. of Mass.*, 892 F. Supp. 2d at 154.

16